IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MAGDALENA EUBANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:15-CV-1019-RP |
| | § | |
| LOCKHART INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court are Defendant's Motion for Summary Judgment (Dkt. 44) and the responsive pleadings and objections thereto. After reviewing the pleadings, the applicable law, and the factual record, the Court issues the following order.

## BACKGROUND

Beginning in 2007, Plaintiff Magdalena Eubank was employed by Defendant Lockhart Independent School District ("the District") as a school counselor, most recently serving in that capacity at Bluebonnet Elementary. She suffers from diabetes, plantar fasciitis, and intermittent vertigo.

At some point at the beginning of the 2014–2015 school year,[1] Plaintiff provided the District with a note from her physician which stated: "Mrs. Eubank is under my care for her medical conditions. Please allow Mrs. Eubank to check her blood sugar during the day as needed, use the restroom as needed, and to have a snack during the day if needed. She also should be allowed to

---

[1] Plaintiff's Complaint includes allegations of discrimination concerning the 2013–2014 school year. However, the Court considers only the allegations concerning the time period after March 28, 2014. Claims arising prior to that date precede Plaintiff's January 22, 2015, charge filed with the Texas Workforce Commission by more than 300 days and are thus barred by the applicable statute of limitations. *See* 42 U.S.C. § 2000e–5(e); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–10 (2002).

wear athletic shoes during the day due to a medical condition." On Friday, August 22, 2014, Rita Sotelo, principal of Bluebonnet Elementary, informed Plaintiff by email that she had received Plaintiff's medical note and would honor the doctor's suggestions. Sotelo encouraged Plaintiff to take care of her personal medical needs and asked that Plaintiff contact her if she needed anything further.[2]

During the first week of school, Plaintiff directed a group of third-grade students in her guidance class to write on a piece of paper whether they believed in God and turn it in to her. Plaintiff apparently did so to determine whether she should play a religious song for her class. The next day, a parent called the school to raise concerns about Plaintiff's actions. The parent stated that his child felt "put on the spot" and was made uncomfortable. The District asserts that this conduct violated the District's Employee Standard of Conduct 3.2.

On August 29, 2014, Sotelo met with Plaintiff and memorialized the meeting in a Memorandum of Conference. The Memorandum addressed the prior day's lesson and the resulting parental concerns. It also noted that Plaintiff had not consistently shown up to work on time. Sotelo included several directives, such as that Plaintiff would report to work on time and refrain from making religious references in class. Sotelo wrote that she would meet with Plaintiff at the end of September to review her compliance with the directives. Plaintiff acknowledged receipt of this Memorandum with her signature.

Plaintiff followed up on this Memorandum by email on September 4, 2014. In this email, she brought up the issue of her ADA accommodations. She stated that she had no time to check her blood sugar or perform other accommodations that had been promised the year before. She pointed out that she had submitted her physician's note a few weeks earlier and acknowledged receiving a

---

[2] Plaintiff makes a number of blanket objections to the District's summary judgment evidence, including this email. The Court overrules Plaintiff's objections for the reasons articulated by the District. (*See* Def.'s Resp. to Pl.'s Objs., Dkt. 70).

response from Sotelo telling her to take care of her health needs. Plaintiff stated that there had been a meeting the prior year that resulted in a letter specifying what her accommodations were and that she assumed another meeting needed to be held. Plaintiff requested "clear instruction" on what to do to take care of her needs in the interim.

Sotelo responded within half an hour. She noted that she was not privy to the events of the prior year, but that she would "gladly accommodate anything [Plaintiff's] health requires." She then provided specific instructions for Plaintiff's accommodations, offering to watch Plaintiff's class if she needed to check her blood sugar levels or have a snack. She stated that she would reach out to Assistant Superintendent Dan Vera for Plaintiff's ADA documentation and promised to comply with the recommendations detailed. She also encouraged Plaintiff to contact Vera directly about setting up a meeting for the new school year.

Later that same day, Cristina Suarez, a District human resources employee, acknowledged receipt of Plaintiff's request for accommodations and stated that Plaintiff's supervisor would inform Plaintiff of the date and time for an ADA Interactive Meeting. The next day, Suarez again reached out to Plaintiff to request additional documentation. Suarez noted that the vague references to "medical condition(s)" in the physician's note were not sufficient to demonstrate a disability under the ADA. She asked that Plaintiff provide additional documentation that establishes Plaintiff's ADA disability, its functional limitations, and the need for reasonable accommodations. Plaintiff responded nearly one week later stating that she did not understand what was needed, as her medical conditions had not changed since her prior accommodations had been approved. She requested clarification of what exactly the District required.

On Sunday, September 7, 2014, Sotelo reached out to Plaintiff requesting that she submit her column for the staff newsletter. It had not been submitted by the preceding Friday, in

accordance with instructions Plaintiff had received earlier in the year. The result was that the newsletter was published without Plaintiff's column.

On September 11, 2014, Sotelo issued Plaintiff another Memorandum of Conference. The two had met to clarify what documentation the District needed to move forward with Plaintiff's accommodation request. The Memorandum notes that Sotelo clarified that Plaintiff's original note was insufficient because it did not specify a medical condition that establishes an ADA disability, its functional limitations, and the need for accommodations. While acknowledging that the formal process had not moved forward because of the inadequate documentation, Sotelo stated she would continue to allow and encourage Plaintiff to take advantage of all accommodations she had previously been allowed. She then directed Plaintiff to submit adequate documentation so that the process could move forward. Plaintiff refused Sotelo's instruction to sign the memorandum, but Sotelo did not "write up" Plaintiff for her refusal.

On September 12, 2014, Suarez sent another message to Plaintiff requesting that she submit additional documentation. Suarez again stated that the physician's letter should establish her disability, its functional limitations, and the need for reasonable accommodations. According to Suarez, the District needed documentation that would enable it to determine whether Plaintiff's condition is considered a disability under the ADA.

On September 16, 2014, Plaintiff sent an email to Sotelo informing her that she was experiencing dizziness and that she was under medical care for the condition. She requested that someone be close to her in the morning during crossing guard duties[3] or any other duty involving moving traffic as a safety precaution. Sotelo sent a response the same day that informed Plaintiff that Sotelo would personally stand close to her in the morning and that she would help in any way

---

[3] According to Sotelo, Plaintiff had been assigned crossing guard duties in duty schedules created before Sotelo joined the District. Plaintiff had complained to Sotelo because she felt crossing guard duties negatively impacted how others would perceive her as a professional.

she could. Plaintiff then responded that she simply did not feel safe doing crossing guard duty at all. Sotelo replied within twenty minutes, reassigning Plaintiff to another duty station and informing her she would contact the human resources department to expedite the ADA process.

Sotelo held another conference with Plaintiff concerning her performance on October 14, 2014. At some point before the meeting, Plaintiff had discussed a student's discipline with her class. The student had been disruptive during a lesson, leading Plaintiff her to refer the student to the main office. While the student was gone, Plaintiff engaged the class in a discussion about what punishment would be appropriate for the student's behavior. This discussion continued after the student returned to the classroom, with Plaintiff asking the student in front of the class what his punishment should be. According the Memorandum of Conference, this approach was inappropriate "because it causes embarrassment to the individual student and could expose some student information that may be confidential or sensitive in nature."

Plaintiff submitted a rebuttal to Sotelo's Memorandum that laid out her own version of events. She agreed that she perhaps should not have made an example out of her student and further stated that she should not have requested assistance from Sotelo because "she basically did nothing to ensure [the student] would think about his actions." Plaintiff again noted that her accommodations had not yet been formally approved. Though acknowledging Sotelo had stated Plaintiff's accommodations would be honored, Plaintiff noted that she was choosing not to take advantage of them until she received formal notice of their approval.

Sotelo issued Plaintiff two further performance directives on October 17, 2014. The first concerned Plaintiff's arriving to work late and informing Sotelo only after she was to have been at work. The second directed Plaintiff to be absent no more than two days per month on average. This directive was motivated by what Sotelo viewed as Plaintiff's excessive absences. Plaintiff responded to these directives by email on October 20, 2014. She blamed Sotelo for her absenteeism and stated

she had only been late on about two occasions. She also accused Sotelo of threatening, intimidating, and harassing her. Finally, she acknowledged receipt of two formal approval letters for her requested accommodations, though she accused the District of backdating the letters.

On October 24, 2014, Sotelo formally reprimanded Plaintiff for her failure to set up small group counseling services with an agency called Connections Individual and Family Services. This was a project assigned earlier in the year. The column Plaintiff sent Sotelo for the September 7 newsletter indicated that she was working on the project. However, Sotelo stated that she learned in a conversation with Bernadette Spears, who appears to be affiliated with the agency, that Plaintiff had not made progress on the assignment. The reprimand also noted Plaintiff's confrontational behavior during meetings.

Plaintiff provided Sotelo a sharply worded rebuttal in which she alleged that Sotelo was engaged in hostility, harassment, and persecution. She denied that she had not been working with the agency to set up small group services. As proof, she pointed to an email she wrote Spears two days after being reprimanded. Plaintiff recalled in that email that she spoke about small groups with Spears a week or two earlier, which resulted in an agreement that they would "pray about it." In her rebuttal, Plaintiff shifted the blame for the lack of small group services onto other teachers who had not referred students for the service. Plaintiff accused Sotelo of being "against counseling" and criticized what Plaintiff viewed as poor communication. Plaintiff concluded: "I am begging you to please stop the hostility, the harassment and persecution. What you are doing is wrong and I am asking you to please stop [i]n the name of Jesus Christ I am praying to God that you stop. May God have mercy on you and whoever is allowing you to do this to me in Lockhart ISD."

Around October 29, 2014, Assistant Superintendent Vera directed Plaintiff to meet with him on October 31 to discuss Plaintiff's performance issues. The next day, Plaintiff drafted a letter that she circulated to certain Bluebonnet Elementary staff members. The letter stated that Plaintiff was

having "tremendous difficulties" working with Sotelo and notified the staff of her upcoming meeting with Vera. Plaintiff requested that the recipients of the letter support her by providing an evaluation of her work if requested by Vera or other administrators.

At the meeting held on October 31, 2014, Vera addressed concerns with Plaintiff's performance and informed her that he intended to recommend that the District's Board of Trustees ("the Board") terminate her contract. He also provided her with an opportunity to resign by November 3, 2014, to avoid that outcome, which Plaintiff declined. Vera reassigned Plaintiff to work at the Special Education campus until her contract status was resolved.

The same day, Sotelo again reprimanded Plaintiff for three performance-related issues. The first concerned errors found in seven of fifteen Student Residency Questionnaires which Plaintiff had been responsible for completing. These questionnaires helped identify which students qualified for homelessness benefits. According to the District, Plaintiff's errors caused students to miss out on needed services or receive benefits to which they were not entitled. The second issue concerned Plaintiff's October 30 letter, which found its way to Sotelo. The third concerned Plaintiff's use of the school copier to reproduce her "personal propaganda" letter during work hours.

Over the days that followed, Plaintiff filed a number of grievances with the District. These grievances alleged discrimination, retaliation, harassment, and the denial of her ADA accommodations. Subsequent investigations by Assistant Superintendent Larry Ramirez found Plaintiff's complaints to be unfounded. Plaintiff complained that Ramirez was not impartial.

On December 15, 2014, the Board voted to propose the termination of Plaintiff's contract. Plaintiff thereafter received a written notice that included a list of ten reasons for her dismissal. On December 29, 2014, Plaintiff requested a hearing on the matter from the Texas Education Agency, which appointed an independent hearing examiner and scheduled a hearing for February 16–17, 2015. Following the hearing, the hearing examiner issued a Recommendation finding sufficient

evidence to substantiate seven of the ten reasons for termination put forward by the District. The examiner concluded that the working relationship between Plaintiff and the District was "irretrievably broken" and recommended the Board enter an order terminating Plaintiff's employment for good cause. The Board adopted the examiner's findings and terminated Plaintiff's employment as of March 12, 2015.

Following an investigation on Plaintiff's charge of discrimination filed in January 2015, the Equal Opportunity Employment Commission ("EEOC") sent Plaintiff a right-to-sue letter in November 2015. The EEOC notified Plaintiff that its investigation failed to substantiate her allegations of non-accommodation, discrimination, and retaliation. Plaintiff filed this lawsuit against the District on November 11, 2015. Plaintiff asserts four claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code § 21.001, *et seq.*; and 42 U.S.C. § 1983. These claims are: (1) failure to make reasonable accommodations for her disability; (2) discrimination; (3) retaliation; and (4) First Amendment retaliation. The District filed its Motion for Summary Judgment on November 1, 2016.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). The court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## DISCUSSION

### 1.     ADA & TCHRA Accommodation Claims

The ADA prohibits covered entities from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112. Discrimination includes the failure to make reasonable accommodations for disabled persons. *Id.* § 12112(b)(5)(A). The TCHRA similarly prohibits discrimination on the basis of disability. Tex. Lab. Code § 21.051(1). Plaintiff alleges that the District violated these statutes by failing to make reasonable accommodations for her disabilities.

To prevail on an ADA failure-to-accommodate claim, a plaintiff must establish that: (1) she is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the employer; and (3) the employer failed to make reasonable accommodations for the plaintiff's limitations. *Feist v. La. Dep't of Justice*, 730 F.3d 450, 452 (5th Cir. 2013). Courts interpret the requirements of the TCHRA similarly. *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006). Accordingly, the Court's analysis concerning the ADA in the following sections is equally dispositive of Plaintiff's TCHRA claims. *See id.*

9

The District argues that Plaintiff cannot establish her failure-to-accommodate claim because she has not shown that she is disabled under the ADA. Defendant also argues that the District provided all requested accommodations, which demonstrates that there is no dispute over whether reasonable accommodations had been provided. Plaintiff responds that she has demonstrated her disability, alleging that her diabetes, plantar fasciitis, and vertigo were known to the District. Further, Plaintiff argues that the District failed to engage in good faith in an interactive process to accommodate Plaintiff's disability, pointing to a delay between her request for accommodations and the District's formal notice that the accommodations had been approved. As the Court finds the provision of accommodations is dispositive here, Plaintiff's disability will be assumed.

The Court disagrees with Plaintiff that the delay in formally approving her accommodations creates a fact issue sufficient to avoid summary judgment. Plaintiff does not seriously dispute that she received accommodations for her ailments at all times relevant to this controversy. Her arguments concerning the delay of formal approval create—at most—a fact issue as to whether the District engaged in the interactive process in good faith. However, the ADA creates a cause of action for failure to accommodate, not for failure to engage in an interactive process alone. The Seventh Circuit has put the issue succinctly:

> While the EEOC regulations accompanying the ADA do suggest that "it *may* be necessary for the [employer] to initiate an informal interactive process with the [employee]" to determine an appropriate accommodation, 29 C.F.R. § 1630.2(o)(3) (emphasis added), there is no separate cause of action for a failure of that interactive process. In this area of the law, we are primarily concerned with the ends, not the means: "Because the interactive process is not an end in itself, it is not sufficient for [an employee] to show that [an employer] failed to engage in an interactive process or that it caused the interactive process to break down."

*Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000)).

Though not stated directly, Fifth Circuit precedent likewise shows that an employer's failure to engage in the interactive process creates liability when such failure prevents reasonable

accommodations. *See Griffin v. UPS, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) ("[W]hen an employer's unwillingness to engage in a good faith interactive process *leads to a failure to reasonably accommodate an employee*, the employer violates the ADA.") (emphasis added). That is simply not the case here. From the time of Plaintiff's first request to the time of formal approval, the record evidence shows that Plaintiff was repeatedly assured that she could take advantage of all accommodations she had requested. Accordingly, no failure-to-accommodate claim lies under the ADA or TCHRA.

A contrary reading of governing precedent would not change this Court's conclusion. "An employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." *Id.* (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)). The record shows that— notwithstanding the District's constant provision of accommodations—the delay in formal approval was due in large part to Plaintiff's failure to provide appropriate documentation for her disability.

"An employee who needs an accommodation because of a disability has the responsibility of informing her employer." *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009). The Fifth Circuit has recognized that "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996). Further, the interactive process serves to identify the disability and "the precise job-related limitations" posed by that disability. 29 C.F.R. § Pt. 1630, App.

Plaintiff has testified that her medical conditions have not impaired her major life functions during any relevant time, with the exception of a short period of dizziness. (Eubank Dep., Dkt. 44-24, at 6–7). Additionally, the physician's note plaintiff offered to the District only vaguely references "medical conditions" and a few requested accommodations. (Physician's Note, Dkt. 44-3, at 27). In

this situation—where Plaintiff's limitations are not readily apparent and the documentation provides little elaboration—the District could reasonably request further documentation as part of the interactive process to identify Plaintiff's limitations and appropriate accommodations. *See Griffin*, 661 F.3d at 225 (finding that no reasonable juror could find the employer had not engaged in the interactive process in good faith though employer had asked for further documentation to establish employee's disability). Plaintiff does not demonstrate that the delay in formal approval was due to any factor other than her failure to provide the additional documentation. Instead, she points out that she had used the same note in prior years without any problem. (Pl.'s Resp., Dkt. 64, at 14). Plaintiff has not provided any authority to show that the District's prior acceptance of vague documentation requires it to do so in perpetuity.

As the undisputed evidence shows that Plaintiff received her requested accommodations at all times relevant to this dispute, Plaintiff's ADA and TCHRA failure-to-accommodate claims fail as a matter of law. Even if Plaintiff could establish that a delay in formal approval of accommodations that were already informally provided is a violation of the ADA, she has provided no evidence to show that she did not cause the delay. Accordingly, the District is entitled to summary judgment on these claims.

**2.      ADA & TCHRA Discriminations Claims**

To make a *prima facie* case of disability discrimination under the ADA and TCHRA, a plaintiff must show: (1) she suffered from a disability; (2) she was qualified for the job; (3) she was subject to an adverse employment action; and (4) she was either replaced by a non-disabled employee or treated less favorably than non-disabled employees. *Milton v. Tex. Dep't of Criminal Justice*, 707 F.3d 570, 573 (5th Cir. 2016). If the plaintiff makes such a showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Delaval v. Ptech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016). If the employer provides

such reasons, the burden shifts back to the plaintiff to establish that the reasons are a pretext for discrimination. *Id.* The plaintiff must rebut each reason offered by the employer. *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

Though Defendant argues that Plaintiff has not established a *prima facie* case, the Court will assume that such a showing has been made for the purposes of this analysis. Defendant has offered seven non-discriminatory reasons for Plaintiff's termination. These are: (1) unprofessional and insubordinate communication; (2) inefficiency, incompetency, inability or unwillingness to perform assigned duties; (3) an inappropriate lesson with students in which she asked them to disclose whether they believe in God; (4) disclosing a student's private educational information and using the student's disciplinary situation for a classroom discussion; (5) failure to follow policy in reporting absences and tardiness; (6) refusal to comply with policies, orders, instructions, regulations, and/or directives; and (7) failing to meet acceptable standards of conduct for employees. These reasons were substantiated by the independent hearing examiner and adopted by the Board in voting to terminate Plaintiff's contract.

In order for Plaintiff's claims to move forward in light of the above reasons, Plaintiff must show that each reason is a pretext for discrimination. *Delaval*, 824 F.3d at 479. Plaintiff correctly points out that there are a number of ways to establish pretext. (Pl.'s Resp., Dkt. 64, at 20). However, as discussed below, the factual record undermines each of the arguments Plaintiff advances.

### A.      False, Unworthy of Credence, Disparate Treatment

The Court begins with Plaintiff's argument that pretext may be shown here because the District's stated reasons for her termination were false or unworthy of credence. *Laxton*, 333 F.3d at 578. Plaintiff does not dispute that she committed the underlying conduct giving rise to the

District's reasons for termination. Rather, she downplays the significance of the conduct or suggests that others were not fired for similar infractions. (Pl.'s Resp., Dkt. 65, at 26–28).

First, concerning her unprofessional and insubordinate communications, she points out that she was the only employee ever fired on that basis despite complaints that Assistant Superintendent Larry Ramirez engaged in similar behavior. However, no evidence in the record establishes that she and Ramirez were similarly situated in any respect. Plaintiff points to the deposition of Superintendent Rolando Treviño, wherein he acknowledged that Ramirez had been investigated following complaints that Ramirez was abrasive with District staff. (Treviño Dep., Dkt. 64-2, at 35). Treviño testified that he could not recall the outcome of the investigation as he did not participate in it, but that he did not believe any discipline was imposed. (*Id.*). This evidence does not show that the behavior Ramirez had been accused of was in any way similar to Plaintiff's, nor does it show that the accusations had even been substantiated. Further, Ramirez and Plaintiff had substantially different positions, job responsibilities, and supervisors. Thus, the District's response to Ramirez's conduct is not probative of discrimination in Plaintiff's case. *See Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005); *Cardiel v. Apache Corp.*, 559 Fed. App'x 284, 288 (5th Cir. 2014).

As to the District's second reason—concerning Plaintiff's errors on the Student Residency Questionnaires—Plaintiff argues that a jury could disbelieve the reason because no one else had ever been fired for that reason and because the errors were resolved the same day they had been discovered. (Pl.'s Resp., Dkt. 64, at 26). Plaintiff points to no evidence showing that anyone else has made the same errors, so the fact that no one else has been fired for doing so has no probative force. Plaintiff's argument that the errors were quickly remedied "centers on her subjective estimation of the practical significance of her [violation] . . . [and] is unavailing . . . ." *Boyd v. Corrections Corp. of Am.*, 616 Fed. App'x 717, 721 (5th Cir. 2015). "Employment discrimination laws are 'not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to

14

transform courts into personnel managers.'" *Bryant*, 413 F.3d at 478 (quoting *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988)).

The District's third reason for terminating Plaintiff's employment is the lesson in which she asked students to disclose in writing whether they believed in God. Plaintiff first argues that a jury could believe the reason is pretextual because it happened only once in the first week and was not repeated. (Pl.'s Resp., Dkt. 64, at 26). This argument again centers on Plaintiff's subjective view of her own violation and does not suffice to establish pretext. *See Boyd*, 616 Fed. App'x at 721. Plaintiff's next argues is that a jury could disbelieve the reason because faculty members lead the school each day in reciting the Pledge of Allegiance, which includes the words "under God." There is, however, little similarity between Plaintiff's actions and the "ceremonial deism" of the Pledge, which the state may not in any case compel students to recite. *See Croft v. Perry*, 604 F. Supp. 2d 932, 937, 941 (N.D. Tex. 2009); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

The fourth reason for Plaintiff's termination is her use of a student's "private educational information" and disciplinary situation in a class discussion. Plaintiff asserts that this reason is "silly" because she did what "any good teacher" would do. (Pl.'s Resp., Dkt. 64, at 27). Plaintiff's evidence of what "any good teacher" would do is the affidavit of Gayle Champion, a teacher at Bluebonnet Elementary. Champion states that she has "often used a student's discipline as a chance to teach students about consequences" and that she knows of other teachers who have done the same without being disciplined for it. (Champion Aff., Dkt. 64-3, at 42). This evidence is exceedingly vague and fails to establish that either Champion or the other unnamed teachers are similarly situated to Plaintiff. Moreover, notwithstanding Plaintiff's position in litigation, the record demonstrates that Plaintiff did not believe she had acted appropriately at the time of the violation. (Resp. to Oct. 14 Mem., Dkt. 43-5, at 69 ("The students had questions and yes I agree may be [sic] I should not have addressed their questions in reference to behavior and consequences when the

opportunity presented itself.");  Answer to Nov. 3 Mem., Dkt. 43-7, at 38 (noting that she

apologized to the teacher, student, class, and student's parent following the incident)).

The fifth given reason is Plaintiff's failure to follow policy concerning absences and

tardiness. Plaintiff argues that a jury could disbelieve this reason because it refers to a single incident

and employees cannot be terminated for a single violation of this policy. (Pl.'s Resp., Dkt. 64, at 27).

However, the record contradicts the assertion that there was only a single incident at issue. The

District disclosed in discovery that Plaintiff had been late "on a number of occasions" and was

"frequently absent." (Resp. to Interrog., Dkt. 64-3, at 29). Plaintiff also acknowledged being late on

more than one occasion. (Oct. 19 Resp. to Directives, Dkt. 43-6, at 4 ("I have only been late about 2

times . . . ."); Answer to Nov. 3 Mem., Dkt. 43-7, at 39 ("I am at work at about 7:15 am every day

except for 2 occasions . . . .")). Thus, the District's typical response to a single violation is irrelevant

and does not demonstrate pretext.

The sixth reason—failure to comply with policies, instructions, or directives—encompasses

several violations. The first is Plaintiff's late submission of a newsletter column. Plaintiff argues that

this occurred only once. Again, however, this argument goes to her subjective assessment of the

violation's significance and does not establish pretext. *See Boyd*, 616 Fed. App'x at 721. The second is

Plaintiff's failure to set up small group counseling. Plaintiff argues that a jury could disbelieve this

reason because Plaintiff had attempted to set up the services. (Pl.'s Resp., Dkt. 64, at 28). The only

evidence Plaintiff provides as support is a reference to her column in the school newsletter stating

that she was working with a counseling center to serve students in small groups. (Hr'g Tr., Dkt. 64-

3, at 9). This conclusory assertion is not probative of any actual attempt Plaintiff may have made to

comply with her obligations. *See Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 798. ("Conclusory

statements in an affidavit do not provide facts that will counter summary judgment evidence . . . .").

The third violation is Plaintiff's refusal to sign a memorandum as directed. Plaintiff does not dispute

the underlying conduct, but points out that Sotelo decided not to write her up for it at the time of the violation. Plaintiff does not explain why that decision insulates her conduct from legitimate consideration when evaluating her record of non-compliance with supervisors' directives.

The seventh and final reason is Plaintiff's failure to meet acceptable standards of conduct. According to Plaintiff, this reason concerns the errors she made on the Student Residency Questionnaires. The analysis above adequately addresses this reason.

As to each of the above violations, Plaintiff has not made the showing necessary to establish that the District's reasons for terminating her employment were false or unworthy of credence. She has similarly failed to show that similarly situated employees were treated more favorably as to any of the above reasons. Accordingly, Plaintiffs arguments on these grounds fall short of establishing that the District's reasons were pretextual.

## B.  Shifting Justifications

Plaintiff next argues that pretext may be inferred because the District's reasons for firing her have shifted and changed over time. *See Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 415 (5th Cir. 2007). Plaintiff's points out that only six general concerns were discussed in the October 31, 2014, conference at which Assistant Superintendent Vera informed her he planned to recommend her termination. (Nov. 3 Mem., Dkt. 64-4, at 27). The official Notice of Proposed Termination, dated December 16, 2014, included ten reasons. (Notice of Proposed Termination, Dkt. 64-4, at 30). Following a hearing, an independent hearing examiner sustained seven of the ten proposed reasons, which formed the basis of the Board's ultimate decision to terminate Plaintiff's contract. (Recommendation of the Independent Hearing Examiner, Dkt. 44-22, at 24).

The Court finds that the record does not support Plaintiff's arguments regarding inconsistency. First, it is not at all clear that the "concerns" Vera addressed in his conference with Plaintiff were intended to be the District's final and exhaustive list of reasons for Plaintiff's

termination. Second, the official Notice provided in December listed several broad, overlapping categories of violations. As Plaintiff recognizes, the same conduct could support more than one of the official reasons for termination. (*See* Pl.'s Resp., Dkt. 64, at 26, 28). For example, Plaintiff's errors on the Student Residency Questionnaires fell under the second and seventh reasons— incompetency and failure to meet acceptable standards of conduct. (*See id.*). Third, Plaintiff overlooks that conduct following Vera's October 31, 2014, conference was used to substantiate the reasons offered in the December 16 Notice. (*See, e.g.*, Recommendation of the Independent Hearing Examiner, Dkt. 44-22, at 28).

Finally, while the hearing examiner sustained only seven of the ten grounds proposed by the District, the examiner still found some evidence supporting the other three. One of these reasons was Plaintiff's failure to put forth a reasonable effort to achieve a rapport with students, parents, the community, other staff, and the Board. (*Id.* at 31). The examiner concluded that Plaintiff had not failed to establish a rapport, *except* as to Sotelo, Vera, and perhaps others. (*Id.*). Another reason was Eubank's conscious misrepresentations to other staff concerning District affairs. The examiner concluded that Plaintiff "may have engaged in making conscious misrepresentations." (*Id.*) The failure of proof was not in showing the representations were false, but rather demonstrating Plaintiff's awareness of their falsity. (*See id.*). The final reason not fully substantiated was "any other grounds constituting good cause for termination." (*Id.*). As to this ground, the hearing examiner merely noted that certain of Plaintiff's acts could fall within multiple grounds provided for dismissal, and that the examiner's failure to discuss it in one category should not be interpreted to exclude it from any other. (*Id.*). Accordingly, the record is clear that the refinement to seven reasons does not represent "shifting justifications," but rather the intervention of a deliberative process imposing a

burden of proof that does not apply here. *See Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991) ("We do not try in court the validity of good faith beliefs as to an employee's competence.").[4]

Plaintiff also argues that the District has adopted inconsistent stances with respect to whether any one of the seven justifications would have sufficed for Plaintiff's termination. According to Plaintiff, the District previously maintained that Plaintiff's termination was based on the "totality of the evidence" and Treviño testified that no single reason was sufficient to justify her termination. (*See* Pl.'s Resp., Dkt. 64, at 24). She asserts that the District's reference to "seven different legitimate, non-retaliatory reasons" constitutes a shift in the District's justifications giving rise to an inference of pretext. (*See id.*). Contrary to Plaintiff's assertion, however, Treviño did not testify that no single reason could support Plaintiff's termination; he testified that his own decision to propose her termination was based on all of the given reasons, not just one. (Treviño Dep., Dkt. 64-2, at 34). Moreover, the District's argument that plaintiff must rebut each of the District's legitimate, non-discriminatory reason merely states Plaintiff's legal burden. *See Delaval*, 824 F.3d at 479. It does not demonstrate a change in position that gives rise to an inference of pretext.

The summary judgment evidence indicates that the District's stated justifications have at all times concerned the same conduct by Plaintiff. Plaintiff has not shown that these justifications have changed in any meaningful way as the course of events progressed toward Plaintiff's termination or thereafter. Accordingly, this argument provides no basis from which to infer pretext.

## C.    Linking Adverse Action to Protected Activity

Plaintiff argues that a jury could find the District's reasons to be pretextual because the District "has repeatedly connected [Plaintiff's] complaints of discrimination and retaliation to her

---

[4] The District bears the burden of proof in hearings before a hearing examiner under the Texas Education Code. Tex. Educ. Code § 21.256(h). Here, however, Plaintiff bears the burden of persuasion at all times. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *Wilson v. Exxon Mobil Corp.*, 575 Fed. App'x 309, 313 (5th Cir. 2014).

proposed and ultimate termination." (Pl.'s Resp., Dkt. 64, at 21). Again, however, the record does not permit such an inference.

Plaintiff asserts that the District disclosed in discovery that several of Plaintiff's complaints concerning her ADA accommodations motivated her termination. (*See* Pet'r's Resp., Dkt. 64-3, at 140). Plaintiff fails to mention that this list was responsive to Plaintiff's request for examples of her "'conscious misrepresentations' of facts to school officials." (*See id.*). Conscious misrepresentations, even when concerning ADA accommodations, can furnish a legitimate basis for adverse employment action. *See Wilson v. Univ. of Tex. Health Ctr.*, 973 F.2d 1263, 1267–68 (5th Cir. 1992); *Plumlee v. City of Kennedale*, 795 F. Supp. 2d 556, 564 (N.D. Tex. 2011) ("Plaintiff is not immune from adverse action for misconduct merely because defendant learned of the misconduct during its investigation of plaintiff's race-discrimination complaint. Nor was defendant required to disregard what it believed to be evidence of plaintiff's misconduct because of the circumstances under which that evidence came to light.").

The Court also notes that Plaintiff's misrepresentations were not considerations in the Board's ultimate decision to terminate her contract. The hearing examiner found insufficient evidence to show that Plaintiff was consciously aware of the falsity of her statements, but nonetheless found that the remaining substantiated misconduct provided sufficient basis for Plaintiff's termination. (Recommendation of the Independent Hearing Examiner, Dkt. 44-22, at 24–36). As the parties have acknowledged, it was the hearing examiner's findings, not the accusations of Sotelo or Treviño, that the Board adopted as the basis for Plaintiff's termination.

As an employee's conscious misrepresentations furnish a legitimate basis for termination, and because Plaintiff's misrepresentations in any case were not factors in her ultimate termination, the Court finds that Plaintiff's argument on this ground fails to show pretext.

D.        **Temporal Proximity**

Plaintiff's final argument is that the temporal proximity between Plaintiff's complaints and the District's adverse employment actions gives rise to an inference of pretext. (Pl.'s Resp. at 24). Plaintiff asserts that pretext "can also be shown with temporal proximity alone." (*Id.*). This is curious, as the case Plaintiff cites for this proposition states just the opposite. *Ameristar Airways, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 650 F.3d 562, 569 n.21 (5th Cir. 2011) ("[T]emporal proximity standing alone is not enough to sustain the plaintiff's ultimate burden."). The Court seriously doubts the probative value of temporal proximity in this case given the frequency and timing of Plaintiff's undisputed misconduct. However, the Plaintiff has put forward no other colorable argument to show pretext and "temporal proximity standing alone is insufficient to establish an issue of fact as to pretext after an employer has provided a non-retaliatory reason." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 487 (5th Cir. 2008). Accordingly, the Court need not address this issue.

In sum, Plaintiff has not demonstrated that the District's legitimate, nondiscriminatory reasons for terminating Plaintiff's employment were pretextual. Accordingly, the District is entitled to summary judgment as to Plaintiff's ADA and TCHRA discrimination claims.

**3.        ADA & TCHRA Retaliation**

A plaintiff establishes a *prima facie* case of retaliation by showing that (1) she participated in a protected activity; (2) her employer took an adverse action against her; and (3) there is a causal connection between the protected activity and the protected actions. *Feist*, 730 F.3d at 454. As with discrimination claims, if the employee establishes a prima facie case, the burden shifts to the employer to offer a legitimate, non-retaliatory reason for the action. *Id.* If the employer makes that showing, the burden shifts back to the employee to show that the employer's reason is merely a

pretext for retaliation, which the employee may accomplish by demonstrating that the adverse action would not have occurred "but for" the employer's retaliatory motive. *Id.*

The parties dispute whether Plaintiff's complaints were too disruptive to be considered protected activity under the ADA. For example, the District points to the hearing examiner's conclusion that Plaintiff demonstrated a lack of ability to write a grievance in a "professional, rational, productive, and forthright manner." (Recommendation of the Independent Hearing Examiner, Dkt. 44-22, at 33). The examiner further found that certain of Plaintiff's communications were "unprofessional, disrespectful, and inappropriately harsh in word in tone." (*Id.* at 28). According to the examiner, "[t]he credible evidence shows that [Plaintiff] threw up a shield of grievances, complaints about her accommodations, and mean-spirited missives every time she received corrective action." (*Id.* at 33). Characterizing Plaintiff's communications as "bullying and personal attacks," the examiner concluded that, "given the desperation evident in [Plaintiff's] writings when her performance deficiencies were exposed," the working relationship between Plaintiff and the District "ha[d] irretrievably broken down." (*Id.*).

The Court finds the hearing examiner's conclusions and characterizations well supported by the summary judgment evidence and accordingly holds serious doubts as to whether Plaintiff's complaints fall under the ADA's protection. *See Kaplan v. City of Arlington*, 184 F. Supp. 2d 553, 565 (N.D. Tex. 2002) (holding that plaintiff's opposition to perceived discrimination was not protected activity where her grievances and rebuttals were consistently hostile and inflammatory and she made unsupported accusations against her supervisors). It is unnecessary to make that determination, however. As detailed extensively above, Plaintiff has not shown that the District's legitimate, non-retaliatory reasons are pretextual. Thus, even if the Court were satisfied that Plaintiff had established a *prima facie* case, her retaliation claims would still fail as a matter of law.

4.      **First Amendment Retaliation**

Plaintiff's final claim arises under 42 U.S.C. § 1983. Plaintiff alleges that the District violated her First Amendment rights by retaliating against her for her protected speech.

To establish a First Amendment retaliation claim in the public employment context, the plaintiff must establish that: (1) an adverse employment action was taken; (2) she spoke on a matter of public concern; (3) her interest in speaking outweighs the employer's interest in efficiency; and (4) the protected speech precipitated the adverse employment action. *Gibson v. Kilpatrick*, 838 F.3d 476, 481 (5th Cir. 2016).

Plaintiff identifies three communications as protected speech. The first is her October 30, 2014, letter to her colleagues. (Oct. 30 Letter, Dkt. 44-4, at 48). In this letter, Plaintiff states that she is having difficulty working with Sotelo and that she is under extreme stress. She suggests that others may be having experiences similar to her own. She then asks her colleagues to help her by providing presumably positive references to Superintendent Vera ahead of their October 31, 2014, meeting. (*Id.*). The second is an email sent December 13, 2014. (Dec. 13 Email, Dkt. 64-4, at 24). In this message, Plaintiff informs her colleagues of the "important Board Meeting" at which the District was to propose her termination. (*Id.*). She details her positive qualifications, outlines her allegations of "unspeakable acts" committed against her, and requests support at the upcoming meeting. (*Id.*). The third is a letter signed by several faculty members expressing that Plaintiff "should not have her contract terminated." (Jan. 27 Letter, Dkt. 64-4, at 3).

The District argues that these communications did not involve a matter of public concern. This is a question of law. *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000), *abrogated on other grounds as stated in Cuviller v. Taylor*, 503 F.3d 397, 401 n.4 (5th Cir. 2007). The Court determines whether Plaintiff's communications involved a matter of public concern by looking at the content, form, and context of her statements. *Lane v. Franks*, 134 S. Ct. 2369, 2380

(2014) (citing *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). These factors weigh against a finding that Plaintiff spoke on a matter of public concern.

### A.    Content

The content of Plaintiff's communications concerned her dispute with the District and her proposed termination before the Board. "Speech is not on a matter of public concern if it is made solely in 'furtherance of a personal employer-employee dispute.'" *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 187 (5th Cir. 2005) (citing *Kennedy*, 224 F.3d at 372). "Typically, an employee speaks in furtherance of his personal employer-employee dispute when he discusses personnel matters directly impacting his job or criticizes other employees or supervisors' job performance." *Id.* Plaintiff's communications do just that. Her October 30, 2014, letter discusses her "tremendous difficulty" working with Sotelo, criticizes her supervisors' "accusations and actions," and enlists support ahead of her meeting with Vera. (Dkt. 44-4, at 48). The Court does not agree with Plaintiff that her isolated supposition that others "may be facing similar circumstances" touches on a matter of public concern. It still goes to "personnel matters directly impacting [her] job" and is a criticism of her supervisor's job performance. *Salge*, 411 F.3d at 178.

Plaintiff's December 13, 2014, email to staff also concerns her employment dispute. (Dkt. 64-4, at 24). The purpose of the email was to get others to attend the meeting at which the Board would vote on her contract termination. Plaintiff asserts in her message that she had always performed to the best of her ability and received excellent evaluations. However, she continues, "[s]ome [District] person(s) have relentlessly tried to force [her] to resign" as counselor. (*Id.*). She then claims that these persons committed unspeakable acts against her, including having police escort her on campus—an act of "hostility and harassment"—banning her from campus, and "detain[ing]" her in the Special Education building. (*Id.*). All of this concerns her personal dispute with the District.

Only two sentences could even conceivably be argued to concern anything else. The first points out that another employee had been fired. This, however, is not tied to any other discussion in the letter and appears to be offered only to suggest the likely outcome of the Board meeting. The second is her assertion that the outcome of the meeting will have an impact for other employees. Again, however, the email discusses no "impact" beyond Plaintiff's potential termination.

The content of the final communication—the January 27, 2015, letter from faculty—also exclusively relates to Plaintiff's employment situation. (Dkt. 64-4, at 3). Not one sentence concerns anything other than reasons why the District should not terminate Plaintiff's contract. (*See id.*). Accordingly, the content of each of Plaintiff's communications weighs heavily against finding that they involved a matter of public concern.

The Court does not agree with Plaintiff that it is enough that her communications impliedly concerned "Sotelo's ability to effectively run Bluebonnet Elementary." (Pl.'s Resp., Dkt. 64, at 30). First, as noted above, speech that merely criticizes employees or a supervisor's job performance does not involve a matter of public concern. *Salge*, 411 F.3d at 187. Second, the Fifth Circuit recently rejected a similar argument in *Gibson v. Kilpatrick*, 838 F.3d 476 (5th Cir. 2016). That case involved a police chief's First Amendment retaliation claim asserted against the city's mayor. *Id.* at 480. The Fifth Circuit acknowledged that "one could contend that how the mayor treats the police chief is a matter of public concern, given the public's interest in effective city governance." *Id.* at 485. Nonetheless, the court cautioned that, "because 'at some level of generality almost all speech of state employees is of public concern,' we must be careful not to conclude speech is a matter of public concern merely because it involves public employees." *Id.* (quoting *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993)). Pointing out that the lawsuit involved an employment dispute and that the police chief had only sought personal relief, the Court held that the content of the police chief's speech did not concern a public matter. *Id.*

Similarly to the police chief in *Gibson*, Plaintiff alleges a public interest in Sotelo's treatment of staff and inability to run the school effectively. However, Plaintiff's communications concerned only the "internal grievance" or her employment dispute. *See id.* Moreover, Plaintiff sought only personal rectification in the form of favorable personal references or the Board's decision not to terminate her contract. The communications do not reveal that Plaintiff was attempting to prevent Sotelo from engaging in the complained-of conduct in the future or otherwise seek redress that reached beyond her own situation. *See id.* ("The suit asks only for personal relief. . . . He chose not to seek an injunction to prevent the mayor from engaging in such future behavior."). Following *Gibson*, the Court concludes that the content of Plaintiff's speech did not involve a matter of public concern.

### B. Form

The Court next addresses the form of Plaintiff's communications. Plaintiff's initial letter and subsequent email were private communications, disseminated selectively among District faculty and staff. *See Chavez v. Brownsville Indep. Sch. Dist.*, 135 Fed. App'x 664, 674 (5th Cir. 2005) ("The form and context of Chavez's speech are even more clearly private in nature. The form of this speech was private as the memorandum was only distributed to BISD employees."). While not dispositive, the private nature of these communications nonetheless remains "part of the context . . . to be considered in determining whether the speech addressed a matter of public concern." *Davis v. West Cmty. Hosp.*, 755 F.2d 455, 461 (5th Cir. 1985). This factor thus weighs slightly against finding that the first two communications involved a matter of public concern. The third communication appears to have been presented publicly at the School Board meeting. The form of this communication weighs more toward finding that it concerned a public matter.

### C. Context

Finally, the Court evaluates the context of Plaintiff's communications. Plaintiff maintains that her communications involved matters of public concern because they were "made against the

backdrop of public debate about Ms. Sotelo's ability to . . . effectively run Bluebonnet Elementary."
(Pl.'s Resp. at 30). As proof, Plaintiff points to a conclusory statement in Gayle Champion's affidavit
that Plaintiff's letter "reflected a debate in the community about Bluebonnet Elementary School, Ms.
Sotelo, and Superintendent Treviño," and vague references to "complaints" against Sotelo. (*See*
Champion Aff., Dkt. 64-3, at 42); *see Lechuga*, 949 F.2d at 798 ("Conclusory statements in an affidavit
do not provide facts that will counter summary judgment evidence . . . ."). Plaintiff has also
produced a local newspaper article detailing a Board meeting at which parents raised concerns about
a number of recent staffing changes at the District. (Lockhart Post-Register Article, Dkt. 64-2, at
165–66). One individual mentioned Plaintiff specifically. (*Id.*).

While Plaintiff's evidence suggests that there was public interest in the District's staffing
changes, the Court does not agree that Plaintiff's communications were made within the context of
this public debate. As discussed above, Plaintiff's communications concerned only her own
situation, not any broader staffing issues that may have been the subject of discussion at the Board
meeting reported by the local newspaper. Nor did Plaintiff's communications address any
complaints against Sotelo or Treviño other than her own. It is thus clear that the context of
Plaintiff's communications was her "personal employment dispute" rather than a broader public
debate about the District's staffing policies. *See Gibson*, 838 F.3d at 487. This factor weighs against
finding that Plaintiff's communications involved a matter of public concern.

On balance, the Court finds that Plaintiff's communications did not involve a matter of
public concern and thus cannot support a First Amendment retaliation claim. The District is
therefore entitled to summary judgment on this claim.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the District's Motion for Summary Judgment. (Dkt. 44). The Court further **DISMISSES** the District's Motion for Leave to Supplement and Motion for Continuance as moot. (Dkts. 66, 75).

**SIGNED** on January 17, 2017.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE